**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION**

| | | |
|---|---|---|
| **JACK ROE,** | ) | CASE NO.: |
| | ) | |
| Plaintiff[1] | ) | |
| | ) | |
| | ) | |
| -versus- | ) | **COMPLAINT** |
| | ) | |
| | ) | |
| **WOFFORD COLLEGE** | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

## I.    NATURE OF ACTION

1.    This is an action for compensatory and punitive damages and costs and attorney fees and other appropriate relief against the Defendant for discrimination on the basis of gender in violation of Title IX of the Education Amendments of 1972, 20 USC § 1681, a failure to accommodate disabilities in violation of the ADA, 20 USC § 12131, as well as breach of contract, violation of the South Carolina Unlawful Trade Practices Act, intentional infliction of emotion distress, negligence/ gross negligence/ recklessness, and conspiracy under the state law of South Carolina.  As averred below, the Defendant, its agents, and others deprived Plaintiff of the investigative and adjudicative tools necessary to clear his name and such deprivation resulted from the gender bias permeating Defendant's institution of higher education and denial of disability accommodations.

## II.    PARTIES

2.    Plaintiff Jack Roe is a resident of Beaufort, South Carolina.

3.    Defendant Wofford College (Woco) is a private college located in Spartanburg, South Carolina.

## III.    JURISDICTION AND VENUE

_____

[1]The Plaintiff will move the Court for permission to proceed pseudonymously in this action but the identity of the Plaintiff has been provided to the parties in a cover letter from undersigned counsel which was served with this Summons and Complaint.  Use of a pseudonym is sought to mitigate damages.

4.	This Court has jurisdiction over the Plaintiff's claims pursuant to 28 USC § 1331 and 28 USC § 1367.

5.	Venue is proper within this District pursuant to 28 USC §§ 1391(b)(1) and (2) because the Defendant is located in South Carolina and the conduct underlying the Plaintiff's claims occurred in South Carolina.

## IV.    FACTUAL AVERMENTS

### The Plaintiff

6.	In high school, Plaintiff was an honor roll student, twice recognized as a 4A all-state pitcher by the South Carolina High School Sports Report, recognized as a high school scholar athlete by the South Carolina High School League, was a homecoming escort, mock trial participant, volunteered with the interact club, worked at his father's law firm, and volunteered in political campaigns including his father's state house campaign, a contemporary candidate's campaign for the US House of Representatives, and the presidential campaign for President Barack Obama.

7.	Plaintiff received scholarships monies to attend Wofford College.

8.	At Wofford College, Plaintiff was a member of a student organization where he served in several committee positions.

9.	Plaintiff attended national leadership training to develop his leadership skills.

10.	Plaintiff worked as a runner at the most prestigious law firm in Spartanburg, South Carolina (the city in which Defendant Woco is situated).

11.	Plaintiff earned these achievements despite several early and chronic medical set-backs.

12.	Plaintiff weighed 1035 grams when he was born.  He was born at 27.7 weeks gestation and remained hospitalized for more than 10 weeks after his birth.

13.	When Plaintiff was less than a week old, his ileal valve was removed from his gastro-intestinal tract.

14.	While Plaintiff's surgery was successful, he nearly died from an infection which developed in the broviac catheter (permanent IV) implanted in his thigh.

15.	Plaintiff's prematurity also led to developmental delays and various language based learning and processing disabilities.

16.    Prior to enrolling at Woco, Plantiff was a student in the Beaufort County School District in Beaufort, South Carolina.

17.    In third grade he was diagnosed with language based learning disabilities and ADHD.

18.    He was accommodated by the school district and was prescribed 10 mg of Ritalin daily.

19.    He also received accommodations on the ACT college entrance exam.

20.    His disabilities were documented in a neuropsychological evaluation by the Medical University of South Carolina; testing by the Children's Health Department (by Dr. Mary Kral); and in the Individual Education Program (IEP) by Plaintiff's high school, which was provided to Defendant.

21.    In May, 2014, Plaintiff first entered a contract with Defendant by submitting a reservation fee.

22.    In August, 2014, Plaintiff enrolled as a full time resident student seeking a bachelor degree from Defendant.

23.    Plaintiff is a male.

24.    Defendant advertised compliance with Title IX on its website, in its handbook and in various posters around campus.

25.    Plaintiff remained in privity of contract under these terms until December, 2016.

26.    Specifically, this contract was extended in the spring semester of 2015, the fall semester of 2015, the spring semester of 2016, the summer term of 2016 and the fall term of 2016.

ZTA and RT

27.    Zeta Tau Alpha (ZTA) is a sorority with a chapter on campus at Woco.

28.    Membership in ZTA is strictly limited to females.

29.    RT is a female who attended Woco.

30.    RT was a sorority sister in the ZTA sorority.

31.    OV was the sorority big sister of RT.

32.    OV was in charge of the yearbook for the calendar year 2015-2016.

33.    OV roomed that year with PG.

34.    PG was also a ZTA sorority sister.

35.    Hearing panel chair Amy Lancaster was also a sorority sister in the same chapter of ZTA.

36.    Lancaster made herself available as a confidant to members of the sorority at the time she served as the hearing panel chair resulting in the adverse outcome suffered by Plaintiff.

37.    Lancaster failed to disclose this relationship and bias.

38.    PG and RT had both expressed romantic interest in Plaintiff.

39.    RT had previously traveled with a sorority sister to the Smoky Mountains, caravanning with Plaintiff and another male student, HS, accompanying them in Plaintiff's vehicle in the fall of 2015.

40.    The four of them stopped and ate together at a restaurant in North Carolina.

41.    While in the mountains, RT tried to get into bed with Plaintiff, referring to him as "PG's [Jack Roe]."

42.    Plaintiff rejected these advances, in large part, because HS had expressed his romantic interests in RT during the ride to the mountains.

43.    RT posted a picture containing herself, Plaintiff, and others on Facebook.

44.    RT then "tagged" Plaintiff in the photo and then "liked" the photo.

45.    RT would later lie and tell both the investigators and the hearing panel that she had never spoken or met with Plaintiff prior to April 16, 2016.

46.    Prior to April, 2016, members of ZTA engaged in a pattern of conduct leading to the issuance of a no-contact order protecting Plaintiff and LB from contact by PG.

47.    Prior to April, 2016, RT's sorority big sister in ZTA removed Plaintiff and his brother from the yearbook.

48.    Plaintiff and LB were the only two students removed from the yearbook.

49.    In fact, students who no longer attended the school were included in the yearbook,

but Plaintiff was removed.

50.    In the spring of 2016, RT engaged in sexual activity with a male student, KL.

51.    When ZTA learned of the circulation of a video of this activity, it threatened RT with sanction if she did not report this as misconduct under Title IX.

52.    RT's complaint involving KL was later determined to be false.

53.    On April 30, 2016, RT engaged in an activity called a "boob luge" where she took off her shirt and served liquor shots off of her naked chest to other men on Defendant's campus.

54.    This activity and the contemporaneous comments of the witnesses and participants were memorialized in a "group me" thread.

55.    One of the persons who participated in this activity was underage.

56.    Defendant's Title IX policy considers "[a] person who deliberately ...supplies another with alcohol for the purpose of rendering that person ...sexually submissive/passive commits a violation of the sexual misconduct policy."

57.    Subsequent to the events in this complaint, as recounted during a sworn deposition, RT threatened to take her clothes off, run down the hall, and tell the RA that her then boyfriend, JA, raped her.

58.    RT then made a complaint against JA which Defendant determined was false.

59.    Including the false complaint against KL, Plaintiff, and JA, that makes at least three times RT filed false Title IX claims.

60.    As a demonstration of gender bias, Defendant reacted to these false claims by placing RT on the student judiciary panel for student conduct.

61.    In early May, 2016, Plaintiff's counsel complained about PG's violation of the no-contact order.

62.    In early May, 2016, Plaintiff's counsel complained about Plaintiff's removal from the yearbook.

63.    <u>False Allegations and the Title IX Process</u>

64.    On May 25, 2016, Defendant notified Plaintiff of allegations made by RT indicating that he had committed sexual misconduct against her at an off campus location around midnight between April 16-17, 2016.

65.    RT alleged that Plaintiff inappropriately touched her in room 701 at the Sand Dunes resort in Myrtle Beach, South Carolina.

66.    Defendant assigned two investigators to review the complaint in May, 2016.

67.    During a June 29, 2016 meeting, Matthew Hammett, Defendant's Deputy Title IX Coordinator, informed Plaintiff's support person that when a male and a female had both been drinking, it was the school's policy to believe the female over the male.

68.    The assigned investigators were Dean Boyce Lawton and Ms. Michelle Griggs.

69.    Plaintiff immediately provided evidence contradicting this allegation.

70.    Plaintiff told Defendant's agents that this was his room and he stayed there from April 15-17, 2016.

71.    Plaintiff informed Defendant's agents that at least ten people, excluding RT, stayed in this three bedroom condo that weekend.

72.    Plaintiff provided information indicating that the bedroom in which he stayed was the closest to the entrance door and contained two beds.

73.    Plaintiff provided information indicating that the entrance door was opened 58 times between 7:00 pm on April 16, 2016 and 1:25 am on April 17, 2016.

74.    Plaintiff provided information indicating that the entrance door was left ajar from 1:30 am until 9:40 am on April 17, 2016.

75.    Plaintiff provided information indicating that the room in which he stayed was a private room, paid for by Mark M.

76.    Plaintiff provided information indicating that his date for that weekend, Katie L, rode four hours back to college with RT.

77.    Plaintiff provided information that Katie L texted Plaintiff that she had a great weekend and texted nothing about any complains made by RT.

78.    By July 24, 2016, Plaintiff provided the names of other witnesses who would state that they were in the condo.

79.    Plaintiff's witnesses included LB, Margo M, BG, LR, A LNU, MC, WH, JM, WS, and HS.

80.   When interviewed, not one of these witnesses corroborated any claim of sexual misconduct despite all being in the condominium at the time in question.

81.   Plaintiff complained in late July, 2016, late September, 2016, and twice in November about the excessive delay in resolving the matter.

82.   Plaintiff specifically mentioned that the stress of the investigation was overwhelming and effecting his educational studies and general well being.

83.   Later, Defendant would blame the delays on an "external source" who was controlling the timing of the Title IX process.

84.   In November, 2016, the investigators informed Plaintiff that BG told them that she saw Plaintiff and RT asleep in the front bedroom and nothing was happening.

85.   The investigators told Plaintiff that Katie L was also a good witness for him because she rode back with RT and said RT never indicated anything was wrong.

86.   Katie L told investigators that she had texted Plaintiff that she had a nice time.

87.   The investigators told Plaintiff that JM was a good witness for him because he stayed in the same bedroom and did not see anything suspicious.

88.   The investigators told Plaintiff that Defendant delegated its Title IX responsibilities to an "external source" "far far away."

89.   No standard of proof to open an investigation or to proceed to a hearing was contained in Defendant's Title IX policy.

90.   Defendant provided no notice to Plaintiff as to these standards either.

91.   Defendant provided not standards or guidance to the "external source."

92.   Instead, the investigators told Plaintiff that this "external source" would decide if RT's complaint would even merit a hearing even though this "external source" never met face to face with anyone involved in the investigation nor learned of any of RT's prior misconduct.

93.   Investigator Griggs told Plaintiff that this "external source" needed Plaintiff to surreptitiously retrieve materials contained in his attorney's file.

94.   Plaintiff told the investigators that they needed to contact his attorney directly.

95.   Investigator Griggs indicated that Defendant wanted to get the materials through Plaintiff directly because of the legal nature of the items sought.

96.    Investigator Lawton told Plaintiff's support person that he had conducted a previous investigation into a complaint made by RT against another male student named KL.

97.    RT's claims against KL were false and unfounded.

98.    RT and ZTA were sanctioned for this false and unfounded report.

99.    The investigative report did not include any information about RT's false claims against KL.

100.   The investigative report did not include any reference to the April 30, 2016 "boob luge" which Plaintiff's counsel provided Defendant even though the report contained RT's claim of trauma from the alleged April 16-17, 2016 incident involving Plaintiff.

101.   The investigative report included a statement that the South Carolina Law Enforcement division investigated RT's complaint.

102.   This statement is unequivocally false.

103.   The "external source" was shielded from the negative information about RT and exposed to false information about Plaintiff through Defendant's actions.

104.   The "external source" then determined a hearing would be proper.

The Hearing

105.   The evidence at the hearing involved a he said-she said situation as to the alleged prohibited act.

106.   No witness was placed under oath.

107.   Only four lay witnesses testified.

108.   Plaintiff and LB testified on his behalf.

109.   VC and RT testified on RT's behalf.

110.   Plaintiff had no ability to secure the attendance of any of his many other favorable witnesses.

111.   At least one witness was attending a playoff football event and was not in town.

112.   The hearing was conducted during exam week.

113.   Only one of the two investigators spoke at the hearing.

114.   Investigator Griggs did not testify as to her opinion that she believed there were three good witnesses for the Plaintiff: BG, KatieL, and JM.

115.   These witnesses did not appear.

116.   Plaintiff was not provided the investigative or adjudicative tools to bring these witnesses or the investigator to the hearing.

117.   Investigator Lawton indicated he could not opine that a RT's statements were more likely than not true.

118.   Lawton's opinion is based in part upon his previous investigations of RT's own misconduct at Wofford.

119.   Lawton investigated a prior false complaint made by RT against student KL.

120.   Melissa Nichols, Title IX coordinator, excluded all reference to this prior false statement despite repeated requests by Plaintiff that this be included.

121.   This exclusion prevented Investigator Lawton from offering the prior false complaint  as a basis for his opinion that proof of RT's allegations against Plaintiff failed to meet the preponderance standard.

122.   Plaintiff testified that he left a private establishment named Mangoes where he had been socializing and consuming alcoholic beverages with others.

123.   Plaintiff testified that he was not drunk.

124.   He first went to a friend's room on a different floor than his unit.

125.   Plaintiff testified that he returned to his room between 1:20 and 1:30 am on April 17, 2016.

126.   He testified that a group of persons were gathered near the railing outside the unit smoking cigarettes.

127.   He testified that when he got into the same bed in the same room he slept the night before, no one else was in that bed.

128.   The time Plaintiff returned to his room is important because JM's statement to investigators indicates he entered the room at 2:00 am and did not see Plaintiff committing sexual misconduct with anyone.

129.    LB testified that he did not drink any alcohol that weekend.

130.    LB testified that he was staying in the bedroom directly across the kitchen from the door to Plaintiff's room.

131.    He testified the area in between the rooms was small.

132.    LB testified that there was a group of people who were in and out of his room talking during the hour or two after midnight.

133.    LB testified that he asked them to please go outside, which they did.

134.    LB testified that he did not hear any complaints or any strange activity or commotion.

135.    VC testified that RT drank a lot of alcohol that night and blacked out, threw up, and crawled in her soiled clothes to the elevator.

136.    VC testified that she asked the hotel manager for a key to room 701 even though neither she nor RT were registered at that room.

137.    VC testified that she did not see Plaintiff at all.

<u>False statements presented during the hearing</u>

138.    False information was presented by RT at Plaintiff's hearing.

139.    RT falsely stated that the front right bedroom of the private condo (Unit 701) rented by a private third party, MM, was the girl's room.

140.    RT falsely stated that the men prohibited the women from possessing hotel keys to the room.

141.    RT falsely stated that she did not know and had never spoken with Plaintiff before April 16, 2016.

142.    RT falsely stated that she awoke to Plaintiff attempting to touch her inappropriately.

143.    RT falsely stated that the April 16/17, 2016 conduct caused her to be unable to attend social functions involving groups of persons associated with Plaintiff's fraternity (PKA) after this date.

144.    RT falsely stated that Plaintiff had committed sexual misconduct before.

The Truth

145.    In fact, as testified to by Plaintiff, Plaintiff possessed exclusive privacy and property interests in this room as a hotel guest.

146.    In fact, Plaintiff stayed in this room from April 15, 2016 through April 17, 2016.

147.    In fact, RT possessed no rights to this room at all.

148.    In fact, RT did not make any arrangements to reside in this room.

149.    In fact, RT was not even in Myrtle Beach until late in the evening of April 16, 2016.

150.    In fact, RT gained access to the room by lying to the hotel staff to obtain a key and get into Plaintiff's bed.

151.    In fact, RT previously knew Plaintiff through his amorous relationship with her close sorority sister.

152.    In fact, RT referred to Plaintiff before this date as "[PG's] [Jack]".

153.    In fact, RT could and did continue to attend social functions with Plaintiff's fraternity as evidenced by her commission of sexual misconduct on April 30, 2016 at a PKA fraternity social function when she served alcohol to an underage male for the purpose of rendering that person sexually submissive by pouring liquor down her bare chest to induce the male to engage in sexual activity with her.

154.    In fact, Plaintiff had not committed any sexual misconduct against anyone at any time.

Defendant's actual knowledge of RT's falsehoods and other false information and failure to correct the same

155.    Defendant's Title IX Coordinator knew of the false nature of RT's testimony.

156.    Defendant's Title IX Coordinator failed to correct this false testimony for the hearing officers.

157.    Defendant's knowledge of the false nature of RT's claims against Plaintiff can be found in Defendant's 2017 Clery Act Report (2017 Clery Report).

158.    In the 2017 Clery Report, Defendant truthfully informs the federal government that **_no_** off campus sexual misconduct occurred during the year 2016.

159.    Defendant's statements submitted in the Clery Act report are subject to sanctions if falsely submitted including fines of up to $35,000.00 per violation.

160.    Defendant's statements submitted in the Clery Act report are true.

161.    Defendant's statement in the Clery Report conclusively establishes that no sexual assault was committed by Plaintiff.

162.    Defendant's Coordinator failed to correct the false information in the investigative report about a law enforcement investigation.

163.    Defendant's Coordinator failed to correct false allegations that Plaintiff committed other misconduct.

164.    Despite the evidence in his defense and because of the flaws later discussed, Plaintiff was found responsible by the hearing panel on December 8, 2016

165.    Plaintiff completed his exams and submitted for a transfer.

166.    Plaintiff's transcript was sent to another school where he was accepted.

167.    Plaintiff withdrew from Woco.

168.    An impact hearing was held, in part, on December 12, 2016

169.    Plaintiff provided his information for the impact hearing on December 14, 2016.

170.    The hearing panel voted to suspend Plaintiff for one calendar year.

171.    Plaintiff had already transferred elsewhere and withdrawn from Defendant's school by that time.

172.    Plaintiff filed an appeal on December 15, 2016.

173.    The appeal was denied on February 6, 2017.

<u>Errors and Flaws in the Proceedings</u>

174.    Defendant committed the following "numerous procedural defects, which taken together" will "satisfy the first element of [the] erroneous outcome claim":

175.    The Defendant continued forward with the investigation against the Plaintiff even though the defendant did not have jurisdiction to investigate under the Defendant's own school year *2015- 2016 Sexual Misconduct Policy.*

176. No official school program or activity occurred at room 701 of the Sand Dunes resort on April 15-17, 2016.

177. By its own policy, Defendant only has jurisdiction to entertain off campus complaints if the conduct occurs at an official program or activity.

178. Defendant maintains a log of such activities.

179. Plaintiff was not attending an event maintained in this log.

180. The Defendant failed to notify the Plaintiff of the nature of the accusations before imposing interim measures on the Plaintiff.

181. The investigators failed to interview exculpatory witnesses provided by the Plaintiff in violation of the *2015- 2016 Sexual Misconduct Policy*'s call for a "thorough investigation"

182. The investigation took over 200 days in direct violation of the Defendant's own school year *2015- 2016  Sexual Misconduct Policy.*

183. The investigation took over 200 days in direct violation of federal guidance issued in 2011 from the Office of Civil Rights of the US Department of Education.

184. Defendant failed to provide the Plaintiff with reasonable disability accommodations during the investigation.

185. The Defendant failed to consider impeaching evidence against RT during its investigation of the incident.

186. The Defendant failed to dismiss the complaint when it became apparent that there were no reasonable grounds under the *2015- 2016  Sexual Misconduct Policy* that sexual misconduct had occurred.

187. Defendant improperly delegated its Title IX responsibilities to an "external source" despite informing Plaintiff that the Title IX personnel in the handbook and policy would be those involved in his case.

188. Defendant's policy has no standard to open an investigation or proceed to a hearing.

189. Defendant allowed the "external source" to apply an unknown standard or make up its when it decided Plaintiff's matter would go to a hearing.

190. The timing delay was made to induce Plaintiff to make another payment for the Fall, 2016 semester and to pay for an expensive travel interim in January, 2017.

191. The timing delay was made to allow Title IX Coordinator to revise and institute a new policy to try to address shortcomings found in RT's complaint.

192. When confronted with prior false allegations made by RT, Defendant applied a new sexual misconduct policy, adopted after RT's allegations, to exclude these prior false allegations.

193. The policy that should have applied would have allowed these prior false claims made by RT.

194. Dean Amy Lancaster operated under a conflict of interest.

195. Federal Guidance that says, "Therefore, any real or **perceived** conflicts of interest between the fact-finder or decision-maker and the parties should be disclosed".

196. The Defendant failed to disclose to the Plaintiff that the hearing board officer, Dean Amy Lancaster, was an alumnus of RT's Wofford Chapter of Zeta Tau Alpha.

197. This was in direct violation of federal guidance.

198. Upon information and belief, the defendant failed to disclose to the Plaintiff that the hearing board officer, Dean Amy Lancaster, was previously involved in workplace sexual misconduct involving a fellow Wofford employee Dr. BC .

199. Defendant failed to provide the Plaintiff with reasonable disability accommodations during the hearing.

200. There was inadequate evidence, on a preponderance level, to find the Plaintiff responsible in the hearing.

201. The Defendant failed to have its agent, Melissa Nichols, recuse herself when it became apparent that her role as ADA coordinator and Title IX coordinator would serve as a conflict of interest.

202. The Defendant failed to have its agent, Melissa Nichols, disclose her prior involvement as a sexual assault advocate.

203. This biases her ability to "ensure that in all cases, the College will respond to the report in a prompt, thorough, procedurally fair, and effective manner"

204. Defendant improperly outsourced the investigation to an "external source" despite assuring Plaintiff that he had met with the investigators involved in his matter.

205. Defendant improperly allowed Nichols to remain in the hearing room during

deliberations.

206.    Nichols' involvement as a lawyer for the college and the Coordinator violates the dual role prohibition.

207.    The dual role providing legal advice to Defendant the hearing panel about Defendant's legal exposure injected an improper interest into the outcome of the Title IX proceedings.

208.    Defendant improperly tried to steal documents from the file of Plaintiff's lawyer by having an investigator ask Plaintiff to take these items so Defendant could review them.

209.    Defendant told Plaintiff that the "external source" asked Defendant to obtain the items from undersigned counsel's file.

210.    Plaintiff possesses independent evidence of the Defendant's efforts to obtain these legally protected confidences.

211.    Hearing panel chair Lancaster collected and destroyed all of the evidence and items presented at the hearing.

212.    Defendant's agents tried to force Plaintiff to hand over his materials for destruction also.

213.    Defendant's agents tried to force undersigned counsel to open his file and turn over his records to Defendant and this interaction was captured on Defendant's video surveillance which is exclusively held in the possession of Defendant.

214.    Defendant imposed an unauthorized hold on Plaintiff's transcript.

215.    This sanction is not authorized for Title IX matters but only for honor code violations.

216.    No valid appeal process was offered as the materials from the hearing were collected and destroyed by Defendant to thwart later review of its misconduct.

Gender Bias

217.    The flaws in the Title IX proceedings were caused by the gender bias of the Defendant.

218.    On June 29, 2016, the Deputy Coordinator told Plaintiff's support person that Defendant believed the female over the male when they had both been drinking.

219.  The Coordinator had previously told a news reporter that men were rarely if ever falsely accused.

220.  The Coordinator met with student athletic advisory committee in 2016 and informed them that men were responsible for the majority of sexual assaults in college.

221.  All of the consent workshops offer by Defendant for students always showed males as the perpetrators.

222.  When Defendant learned that undersigned counsel had written the federal government on May 23, 2016 concerning gender bias, the Coordinator falsely promised a gender bias investigation would be referred to the Dean of Students.

223.  Coordinator never made this referral.

224.  Defendant never conducted any gender bias investigation.

225.  Instead, Defendant was deliberated indifferent to various claims of sexual misconduct made by males against females.

226.  Defendant knew that sexual misconduct complaints had been filed against PG by two men, including Plaintiff, but no proceedings were begun.

227.  Defendant knew of RT's "boob luge" misconduct involving an underage student but no proceedings were begun.

228.  Defendant knew that RT committed sexual misconduct in the campus library with a dildo but no proceedings were initiated.

229.  Defendant knew that RT made false claims against male student, KL, but no proceedings were initiated.

230.  Defendant knew that RT made false claims against male studen, JA, but no proceedings were initiated.

231.  Defendant's gender bias is also demonstrated by the deliberate indifference to male students' complaints that females violated no contact orders issued under Title IX.

232.  Defendant knew that two men, including Plaintiff, complained that PG violated a no contact order in an unrelated matter but no proceedings were begun.

233.  Defendant knew that female student, RL, violated a no contact order regarding male student, CG, in an unrelated matter but no proceeding was begun.

234.    Defendant rewarded sexual misconduct committed by Lancaster and RT by promoting them to positions of authority regarding student conduct proceedings.

235.    Defendant promoted Lancaster to Deputy Title IX Coordinator after her ruling in Plaintiff's case.

236.    Defendant promoted RT to the student judiciary panel following her false testimony against Plaintiff and despite her other false claims against male students KL and JA.

237.    Defendant's Coordinator served in the dual role as lawyer and Title IX Coordinator to assist Defendant in conducting a cost benefit analysis in which the Defendant's legal exposure to females complaining of sexual assault was determined to be greater than its exposure to males who were falsely accused.

The Adverse Outcome was Erroneous

238.    Plaintiff testified that he did not commit misconduct.

239.    Defendant told the federal government in multiple Clery reports that no off campus misconduct occurred during 2016.

240.    BG told investigators that RT had no memory of the night before.

241.    JM said the only thing he saw in the room was two people sleeping

242.    LR said he saw no suspicious activity.

243.    Defendant's administrator TH told Plaintiff that "victim" was not the word that came to mind to describe RT.

## V.    LEGAL CLAIMS

### FOR A FIRST CAUSE OF ACTION
### ERRONEOUS OUTCOME IN VIOLATION OF 20 USC SECTION 1681

244.    The allegations set forth above are repeated as if included herein.

245.    Defendant receives federal financial assistance and did so during the time relevant to this Complaint.

246.    Title IX compliance required that Defendant provide Plaintiff the investigative and adjudicative tools necessary to clear his name.

247.    The Title IX proceedings against Plaintiff were procedurally flawed.

248.  The Title IX proceedings against Plaintiff were also substantively flawed.

249.  These flaws led to an erroneous outcome.

250.  These flaws led to an outcome that was adverse to Plaintiff.

251.  The gender bias of Defendant and its agents motivated the erroneous outcome.

252.  These flawed and biased actions and omissions of the Defendant caused the Plaintiff to suffer damages.

253.  These damages include mental and physical injury, damage to reputation, disgrace, shame, humiliation, embarrassment, anxiety, depression, monetary loss and economic damages, loss of investment, loss of future earnings and other damages.

**FOR A SECOND CAUSE OF ACTION**
**DISCRIMINATION BASED ON DISABILITY IN VIOLATION OF TITLE II**
**OF THE ADA, 42 USC SECTION 12131**

254.  The allegations set forth above are repeated as if included herein.

255.  Notwithstanding that Wofford had accommodated Plaintiff in his daily educational career, the Defendant failed to afford Plaintiff disability accommodations during the investigation and hearing process.

256.  Plaintiff's disabilities, which were known and documented by Woco, required accommodations to allow re-do's and additional time on assignments to further process and formulate thoughts.

257.  Yet, in the investigative interviews with Plaintiff, in the issuance of the investigative report, during the hearing proceedings and questioning, and in issuing its hearing findings and conclusions, Defendant omitted the disabilities or the fact that it had failed to provide Plaintiff with the proper accommodations.

258.  Defendant failed to provide the "external source" third party, to whom control over the investigation was delegated, any notice of Plaintiff's disabilities or the accommodations that were provided or denied during the interviews of Plaintiff or other parts of the Title IX process.

259.  Given that Defendant was charged with resolving disputed facts, it was vital to the integrity of the process that the hearing panel understood how Plaintiff's disabilities might affect his immediate responses to oral or written questions.

260.    In a "he said/she said" situation such as this, in which there were no independent third party witnesses as to the disputed allegation, it was crucial that the hearing panel make an accurate assessment of credibility.

261.    Plaintiff is a "qualified individual with a disability" as defined in 42 U.S.C § 12131 (2) because Plaintiff has ADHD and language based learning disabilities as well as adjustment disorder, which is a form of depression.

262.    The ADA and its implementing regulations require entities such as Defendant to provide programs and services in an integrated setting and to make reasonable modifications in policies, practices, and procedures that deny equal access to individuals with disabilities.

263.    Plaintiff has been denied the modifications in Defendant's practices, namely its investigation and hearing processes.

264.    As a result of Defendant's denial of modifications including use of PowerPoint and delays for Plaintiff's processing concerns including the ability to consult with his support person during the questioning period, Defendant violated the ADA by discriminating against Plaintiff due to his disability.

265.    As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### FOR A THIRD CAUSE OF ACTION
### BREACH OF CONTRACT

266.    The allegations set forth above are repeated as if included herein.

267.    The Plaintiff entered a binding contract with Defendant beginning in the spring of 2014.

268.    Defendant offered the Plaintiff educational services.

269.    This offer was made in the spring of 2014 and accepted by the Plaintiff on or about May, 2014.

270.    This offer was repeatedly extended by Wofford and accepted by Plaintiff again in the spring of 2015, fall of 2015, spring of 2016, summer of 2016, and fall of 2016.

271.    The Plaintiff agreed to pay money to Defendant in exchange for the provision of educational services under certain conditions.

272.    Defendant requested that the Plaintiff completely comply with 100% of the

requested payment down to the last penny.

273.  In exchange for the money consideration, the Plaintiff was assured that Defendant would provide educational services in a setting governed by certain procedures.

274.  The bargained for conditions included compliance with Title IX law, Title IX policy of the school, and other applicable provisions of law including the ADA.

275.  Compliance with stated policies and procedures was a material condition of the contract.

276.  The assurance that Defendant would deliver educational services in compliance with Title IX law and the ADA was advertised in the internet website of Wofford published in many places including Beaufort County, South Carolina.

277.  The assurance that Defendant would deliver educational services free from procedurally flawed and biased proceedings and instead fair and equitable proceedings was memorialized in the handbook written and provided by Defendant to the Plaintiff.

278.  The assurance that Wofford would deliver educational services in a fair and equitable manner and consistent with stated policy and law was reaffirmed every year and, in August, 2016, was the subject of a specific email sent by President Samhat to the Plaintiff.

279.  This email was received by the Plaintiff in Beaufort, South Carolina.

280.  The Plaintiff followed this email with payment for educational services to be delivered from September, 2016 through January, 2017.

281.  The Defendant breached this contract by failing to comply with Title IX law and the ADA

282.  The Defendant breached this contract by failing to follow its policies regarding Title IX.

283.  The Defendant breached this contract by extracting an unauthorized Title IX sanction.

284.  The Defendant breached this contract by failing to committing the flaws referenced above.

285.  The Defendant breached this contract by destroying evidence supporting the Plaintiff's positions.

286. The Plaintiff suffered damages from Defendant's breach of the terms of these contracts.

287. But for Defendant's breach, the Plaintiff would not have suffered an erroneous outcome at the hearing.

288. But for Defendant's breach, the Defendant would have admitted that no off campus sexual misconduct occurred in 2016.

289. These breaches caused damage to the Plaintiff.

290. But for these breaches, the Plaintiff would not have suffered the damages he did.

291. But for these breaches, the Plaintiff would not have suffered injury to the extent he did.

292. These damages include, but are not limited to, bodily injury, mental and physical suffering, economic loss, loss of investment, loss of earning potential, anxiety, humiliation, damage to reputation and emotional distress.

## FOR A FOURTH CAUSE OF ACTION
## UNLAWFUL TRADE PRACTICE ACT VIOLATION

293. The allegations set forth above are repeated as if included herein.

294. Defendant engaged in deceptive acts as to their compliance with Title IX, the ADA and other related procedures.

295. Defendant engaged in deceptive acts as to the enforcement of their policies regarding Title IX and related procedures.

296. The promised policies stated by Defendant serve to protect members of the public from discrimination on the basis of gender or disability.

297. Compliance with Title IX, the ADA, and related procedures is in the public interest.

298. The Defendant's deception undermines the purported protections promoted by Defendant and places the public at risk.

299. The Defendant's deception was capable of repetition.

300. The Defendant's deception was in fact repeated as to others mentioned in the averments above.

301.    The Defendant's acts constituted a violation of the Unfair Trade Practice Act (UTPA).

302.    The Defendant's violations of the UTPA were willful because it knew or should have known that its acts violated the UTPA.

303.    The Plaintiff suffered damages because of Defendant's noncompliance with Title IX, the ADA, and related procedures.

304.    The Plaintiff suffered damages because of Defendant's failure to follow its policies.

305.    The Plaintiff suffered damages because he was subjected to baseless Title IX proceedings and deprived of accommodations during the process.

306.    The Defendant's deceptive acts caused the Plaintiff to suffer these damages.

307.    But for the deceptive acts, the Plaintiff would not have parted with more than he received in return.

308.    But for the deceptive acts, the Plaintiff would not have suffered common law damages.

309.    The damages suffered by the Plaintiff include, but are not limited to, money damages, loss of investment, damage to reputation.

**FOR A FIFTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

310.    The allegations set forth above are repeated as if included herein.

311.    The Defendant intentionally or recklessly inflicted severe emotional distress upon the Plaintiff or were certain or substantially certain that such distress would result from their conduct.

312.    The Defendant engaged in a pattern of conduct and not just an isolated instance.

313.    The Defendant engaged in this conduct knowing that the Plaintiff was vulnerable.

314.    The Defendant were in a position of power or authority over the Plaintiff

315.    This conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community.

316. The emotional distress suffered by the Plaintiff was so severe that no reasonable person could be expected to endure it.

317. The actions of the Defendant damaged the Plaintiff causing, among other things, severe emotional distress, physical and mental suffering, bodily injury, anxiety, humiliation, disgrace and shame.

## FOR A SIXTH CAUSE OF ACTION
## NEGLIGENCE/GROSS NEGLIGENCE/ RECKLESSNESS

318. The allegations set forth above are repeated as if included herein.

319. Defendant owed duties to the Plaintiff to comply with Title IX and the ADA.

320. Defendant owed duties to the Plaintiff to respect his protected relationship with his attorney.

321. Defendant owed duties to the Plaintiff to provide him with the necessary investigative and adjudicative tools to clear his name even when there are no due process requirements.

322. Defendant owed duties to follow policies regarding Title IX and the ADA.

323. Defendant owed duties to not retaliate against the Plaintiff.

324. Defendant owed duties to preserve evidence so that he could clear his name.

325. Defendant breached these duties by providing flawed proceedings.

326. Defendant breached these duties by enforcing the policies inappropriately.

327. Defendant breached these duties by destroying evidence.

328. Defendant breached these duties by hiding bias.

329. Defendant breached these duties by outsourcing responsibilities to third parties but shielding these third parties from critical evidence.

330. Defendant breached these duties by failing to properly train and supervise their agents to comply with the duties owed to the Plaintiff.

331. Defendant breached these duties by attempting to breach the Plaintiff's attorney's file materials.

332. These breaches occurred through the negligence, reckless, and intentional conduct

of the Defendant.

333.    The Plaintiff suffered damages caused by these breaches and, but for these breaches, the damages would not have occurred or would not have occurred to the extent to which they did occur.

334.    The Plaintiff suffered damages from these breaches, including but not limited to, mental and physical anguish, bodily injury, humiliation, embarrassment, loss of investment, and loss of opportunity for peaceful and quiet provision of educational services.

**FOR A SEVENTH CAUSE OF ACTION**
**CONSPIRACY**

335.    The allegations set forth above are repeated as if included herein.

336.    The Defendant and others, known and unknown and the "external source" agreed to and did work in conjunction with each other to breach the attorney client privilege between Plaintiff and undersigned counsel.

337.    The Defendants and others, known and unknown and the "external source" agreed to and did work in conjunction with each other to cover up the flawed and biased proceedings brought and continued against Plaintiff.

338.    The Defendant and others, known and unknown and the "external source" agreed to and did work in conjunction with each other to prevent discovery of the identity of the "external source."

339.    The Defendant and others, known and unknown and the co-conspirators agreed to and did work in conjunction with each other to violate the Title IX and ADA rights of the Plaintiff.

340.    The Defendant and the co-conspirators entered these agreements with the purpose of injuring the Plaintiff.

341.    The Defendant and the Co-conspirators committed these acts with malice

342.    These acts caused the Plaintiff to suffer special damages including, but not limited to, exposure to sham Title IX allegations, economic loss incurred in revealing the cover up, bodily injury, physical and mental suffering, anxiety, humiliation, disgrace and shame.

**WHEREFORE,** the Plaintiff request that this Court:

a.      Accept jurisdiction over the action;

b.      Empanel a jury to fairly hear and decide this action;

c.      Award to the Plaintiff compensatory damages resulting from their pain and suffering resulting from the Defendant's deliberate indifference;

d.      Award to the Plaintiff punitive damages and treble damages as determined by a jury and allowed by law;

e.      Award to the Plaintiff reasonable attorneys' fees and costs expended in litigating this matter; and

f.      Award to the Plaintiff such other relief as it deems just and proper including and injunctive relief preventing publication of and requiring removal from official records of any and all references to the false and erroneous information, claims, and outcomes discussed in this complaint.

**Respectfully Submitted by:**

/s/James A Brown, Jr.
James A. Brown, Jr.                              May 24, 2019
Federal ID# 7646                                 Beaufort, SC

Law Offices of Jim Brown, P.A.
1600 Burnside Street, Suite 100
P.O. Box 592
Beaufort, SC 29901-0592
(843) 470-0003

Attorney for the Plaintiff